## YOUNG et al. v. GENERAL ELECTRIC CO.
### No. 50 C 304.

United States District Court
N. D. Illinois, E. D.
Jan. 5, 1951.

Richard James Stevens and Burton H. Young, Chicago, Ill., for plaintiffs.

Stephen A. Mitchell and Charles A. Bane (of Mitchell, Conway & Bane), Chicago, Ill., substituted counsel for plaintiff John Wentworth.

Charles H. Walker and John Farley (of Fish, Richardson & Neave), New York City, and James P. Hume (of Wilkinson, Huxley, Byron & Hume), Chicago, Ill., for defendant.

BARNES, Chief Judge.

On March 7, 1950, Hugh E. Young, individually and as trustee, and John Wentworth filed their complaint in this court, and thereby alleged that Hugh E. Young, individually, was the owner of a 10% interest, that Hugh E. Young, as trustee, was the owner of a 70% interest, and that John Wentworth was the owner of a 20% interest in Letters Patent of the United States No. 2,179,569 on motor control apparatus, issued November 14, 1939, to said

Hugh E. Young on an application filed March 15, 1933, and No. 2,086,594 on motor control apparatus, issued July 13, 1937, to said Hugh E. Young on an application filed June 11, 1934, and that the defendant General Electric Company had manufactured, used and sold, within the United States, motor control apparatus embodying said patented inventions and infringing said Letters patent. The prayer of the complaint was for an injunction, an accounting of profits, and damages.

The answer of the defendant, General Electric Company, was filed on April 28, 1950. The defendant denied that Hugh E. Young was the inventor of the devices described in the patents in suit, but admitted that applications for patents were filed by Hugh E. Young and that the patents were issued to Hugh E. Young on said applications. Defendant denied knowledge or information sufficient to form a belief as to the ownership by the plaintiffs of the interests in said patents, denied that defendant has infringed the patents, and denied that plaintiffs have caused notice to be given to the defendant of its infringement but admits the receipt, in due course, of a letter dated December 15, 1949, from Hugh E. Young. The defendant further averred that both patents are invalid for the reasons that they involve no invention over the prior art, that Hugh E. Young was not the original and first inventor of said alleged improvements described in said patents, and that the patentee had failed particularly to point out and distinctly to claim the part, improvement or combination which he claims as his invention or discovery. The defendant, on information and belief, averred that, by reason of the proceedings in the Patent Office during the prosecution of the applications which have resulted in each of the patents in suit, plaintiffs were estopped to claim for said patents a construction such as would cause said patents to cover or include the acts of the defendant of which plaintiffs complain. Defendant also averred that more than six years prior to the filing of the complaint and for more than six years prior to the receipt by the defendant of any notice of alleged infringement of the patents in suit, defendant has been extensively and openly manufacturing, selling, using and advertising for sale, within the United States, motor control apparatus of the same character as the apparatus complained of in this suit; that plaintiffs and their predecessors in interest had contemporaneous knowledge of these activities by defendant and had opportunity to obtain information as to the details of construction of the motor control apparatus advertised and sold by defendant, but plaintiffs and their predecessors in interest allowed defendant to build up a large business in the manufacture and sale of motor control apparatus of the type complained of in this suit, and delayed asserting any charge of infringement of the patents in suit until at least as late as December 15, 1949; that during this period of delay and after the initial sales and advertisement by defendant of motor control apparatus of the type complained of, defendant has expended large sums of money in advertising such motor control apparatus, in tooling up for its production, and in developing and engineering similar motor control apparatus; that during the period of plaintiffs' delay, two men, Eugene H. Haug and Stanley Plaisance, whom defendant might have called as witnesses in this suit, and whose testimony it is believed would have been of material aid to defendant, have died; that, as a result of the long and inexcusable delay of plaintiffs and their predecessors in interest in bringing suit, defendant's position has been changed to its detriment; and that plaintiffs and their predecessors in interest are guilty of such laches that they are estopped now to assert infringement by defendant or to maintain this suit. On November 28, 1950, during the course of the trial, the defendant, by leave of court, filed an amendment to its answer, wherein it added to its original answer the following: "The said Hugh E. Young was not the original, first or sole inventor of the subject matter of said patents but the same was conceived and developed by one Eugene H. Haug and/or Stanley F. X. Plaisance, either individually or jointly with the said Hugh E. Young."

The trial, which consumed twenty-six and one-half court days, commenced on October 5, 1950, and continued, with two interruptions, until December 1, 1950. Briefs of counsel were prepared during the course of the trial and were read by the court prior to the final arguments of counsel, which took place on December 1st. On that day, seven hours were devoted to the arguments.

The drawings of Patent No. 2,179,569, to which counsel called the court's attention, are Figures 1 and 2 next hereinafter set forth:

*Fig 1.*

*Fig 2.*

In this patent, the patentee, at page 1, column 1, line 1, says:

"The present invention relates to the control of current flow to motors and the acceleration thereof.

"The starting and acceleration of electric motors, particularly such as are operated from an alternating current supply line, has heretofore generally been accomplished by the employment of resistance in the rotor circuit or reactance in the line to hold back the current flow when the counter-electromotive force is lacking or lower than desired.

"It is an object of the present invention to employ an electron tube operating within and upon the individual cyclical impulses of impressed potential and resultant current flow instead of employing resistance, for regulating starting, acceleration speed control and reversing of a motor.

"According to my invention, an automatic current sensitive regulator controls the time of firing of the control tube for each cycle in order to limit the effective current flow. Thus, instead of wasting energy in the resistance as frequently employed, the tube permits the selection of such parts of the current wave as are required to make up the predetermined current flow, even though the resistance of the motor circuit to current flow be merely the ohmic resistance of the motor as at standstill or the ohmic resistance plus the counter-electromotive force when the motor is operating at some selected speed, or the ohmic resistance minus the counter-electromotive force when the motor is plugged, i. e., connected in reverse while mechanically running forward.

"The regulator controls the phase shift of grid excitation of the tube, either by a movable core of an inductance as shown in one embodiment, or by magnetically varying the inductive effect of a grid phase control circuit, as shown in another modification, with the result that no matter what the variations of line potential or resistance to current flow due to conductivity, or counter-electromotive force, the current will be the same, and will not ex-ceed the predetermined value. Thus it is possible to throw the motor directly across the line without taking any more current than the predetermined value. Similarly, it is possible to plug the motor, i. e., throw the control switch to reverse while the motor is running full speed forward without allowing any more than the predetermined current to flow therethrough.

"The invention applies not only to direct current motors which are operated by rectified current, but may also be applied to alternating current motors, as hereafter described and illustrated in detail.

"Now in order to acquaint those skilled in the art with the manner of constructing and operating my invention, I shall describe, in connection with the accompanying drawings, a specific embodiment of the same.

"Figure 1 is a general schematic diagram of the invention applied to a D.C. series motor; Fig. 2 is a diagram of a modified embodiment of my invention;"

Further, on page 1, column 2, line 14, the patentee says:

"Referring to Fig. 1, 1 and 2 indicate the A.C. power lines. A transformer M supplies current to a phase splitting device consisting of a coil 4 connected in series with a resistance 5. The inductance of coil 4 is changed by any movement of the plunger 6 which is connected to a lever 7 pivoted at the point 8 and actuated at the other end by an iron plunger 9 operating in a solenoid 10. The plunger 9 is controlled manually by an adjustable handle 11 through a spring 50. Current necessary for the operation of the motor is taken from the power supply line by means of a transformer N. One side of the secondary winding is connected to the plate 13 of the tube A. The other terminal of the secondary connects to the plate 14 of the tube B. The filaments 15 and 16 of tubes A and B, respectively, are operated by a transformer T and are connected together by the wires 17 and 18. The D.C. series motor C is connected at one end to the filaments of tubes A and B and through solenoid 10 to the center tap 19 of trans-

former 12. The control voltage for the grids 20 and 21 of tubes A and B is obtained from the phase splitting device between points 22 and 23, this voltage being applied to the grids 20 and 21 through transformer 24.

"The operation of the circuit is as follows: The tubes A and B operate as half wave rectifiers and supply a current for the motor C in the usual manner. The mean position of the plunger 10 is adjusted by setting of the adjustable handle 11 operating through spring 50. If, for any reason, the current through the motor changes, the plunger 9 will be operated upon by the current through solenoid 10 and will result in moving the plunger 6 from its normal position, which normal position depends upon the tension of the spring 50. The change in inductance resulting from any change in position of plungers 6 will, in turn, change the phase of the voltage between points 22 and 23 and this, in turn, will operate upon the grids 20 and 21 of tubes A and B so as to keep the current through the motor substantially constant. The relative movement of the plungers 9 and 6 are such as to cause the inductance 4 to increase when the motor current increases and thus causes the grid voltage to become more out of phase with the anode voltage which, of course, reduces the average motor current to substantially its former value. The opposite action takes place when the motor current decreases. Since this effect takes place at any given set position of the plunger 9, it is evident that the motor can be reversed without drawing an excessive current.

"From the above it may be seen that the motor may be connected at standstill to the source of pulsating direct potential and the current will be limited to the selected predetermined value by the operation of the regulator 10–4. The impulses of current are selected portions of the rectified waves, and are peculiarly effective to start a load because of their momentary high value, although the mean effective value may be much lower. As the motor accelerates the counter-electromotive force builds up with increasing speed, but the regulator 10–4 shifts the phase of grid excitation to increase the potential applied until the predetermined value of current flow is again restored. This adjustment is substantially instantaneous in that it occurs within the cycle of commercial frequency. Likewise, the motor may be reversed at full speed. This is generally termed 'plugging the motor.' When so reversed at full speed, the counter-electromotive force of the armature acts like a negative resistance, but through the action of the regulator 10–4, the effective current does not rise above the predetermined value.

"The frequency of the impulses of direct current is fixed by the frequency of the alternating current supply 1–2. The regulator 10–4 is capable of shifting the grid potential through substantially 180 electrical degrees, and hence is capable of maintaining the current flow within a predetermined limit or constant as desired throughout all speed and load conditions within the torque of the particular predetermined current value. By shifting the grid potential from zero angle towards 180° angle not only is the duration of applied potential for each impulse varied, but also the effective potential throughout said period is varied.

"In order to change the speed of the motor it is only necessary to change the inductance of coil 4 by moving handle 11.

"Referring to Fig. 2, 30 and 31 indicate the A.C. power supply. The filaments of Tubes C and D are supplied with current by the filament transformer E. Another transformer F supplies A.C. voltage to the plates 33 and 34 of tubes C and D from the secondary terminals 35 and 36. Two other terminals 37 and 38 of the secondary furnish the voltage for the phase splitting device made up of resistor 39, variable inductance 40 and the counter-electromotive force coil 41. The voltage for the grids 42 and 43 of Tubes C and D is supplied through the grid transformer G. One end of the primary windings of this transformer is connected to the point 44 forming the common connection between resistor 39 and variable inductance 40. The other end of the primary winding is

connected to the center tap 45 of transformer F. A direct current series motor L is operated by the impulses of direct current potential supplied by the tubes C, D. The D.C. voltage required to operate the motor is obtained between points 46 and 47 which constitute the output terminals of the tubes C and D.

"Operation of the apparatus shown in Fig. 2 is practically the same as that of Fig. 1. The current to the motor is controlled by shifting the phase of the voltage applied to the grids of the tubes C and D, and the phase of the control voltage can be adjusted by means of variable inductance 40. Since the inductance 40 can be changed by very small steps, it is evident that a very fine control of the speed of the motor can be obtained.

"Anodes 33 and 34 are connected to transformer F through primary coils $41^a$ and $41^b$, which induce a counter-electromotive force into secondary coil 41. This C.E. M.F. produces the same effect in the phase split circuit as an addition of inductance. The coils are so coupled with the proper number of turns that the current in the anode circuit is held constant, thus protecting the motor at all times from an overload of current."

Claims 1 and 2 of this patent are in suit. They are as follows:

"1. In combination, an alternating current supply line, a variable speed motor adapted to be operated by energy from said line from zero or negative speed to full positive speed, an electron valve device controlling the flow of current through said motor, said valve having a firing control electrode, means for applying a firing control potential to said electrode, and a regulator having an actuating winding in series relation with the flow of motor current to be controlled and having means governed by said winding to shift the phase of firing potential applied by said first named means throughout substantially 180 electrical degrees to limit the current to less than a predetermined value from negative to zero speed of the motor to full positive speed of the motor."

"2. In combination with a source of alternating current potential, a variable speed motor having a rotor provided with windings, a circuit for said rotor supplied with energy from said source, means to control the flow of current in said circuit comprising a grid controlled arc rectifying tube, a phase control circuit for said tube including a regulator having a movable part for shifting the phase of grid excitation through substantially 180°, means in series relation to said circuit for moving said movable member according to the current flow in said circuit for limiting the flow of current in said circuit to substantially a predetermined value for all speeds of said motor."

The only drawing of Patent No. 2,086,594 called to the court's attention was Figure 6, which is as follows:

116

_Fig. 6._

In this patent, the patentee, at page 1, column 1, line 1, says:

"This invention relates to motor control apparatus and more particularly to such apparatus designed to operate a direct current motor from current derived from an alternating current source.

"This application is a continuation in part of my co-pending application on Motor control, filed March 15, 1933, and bearing Serial No. 660,955.

"One feature of this invention is that it permits the operation of a direct current motor on a rectified alternating current with a high power factor; another feature of this invention is that it includes means for completely and automatically preventing any current surges or overloads through the motor; still another feature of this invention is that it provides convenient and effective manual control throughout a wide range of speed variation; another feature of this invention is that it provides a high starting torque; other features and advantages of this invention will be apparent from the following specification and the drawings, in which,—"

Further, on page 1, column 1, line 35, the patentee says: "Fig. 6, illustrates a circuit wherein control grids are used in the tubes feeding the armature."

Further, on page 3, column 1, line 62, the patentee says:

"In the form shown in Fig. 6 no impedance transformer or saturable core reactor in circuit with the primary 35 is used, but instead control is achieved through control means inserted directly in the tubes feeding the armature and series field, shown here as grids 118 and 119 in the controlled arc rectifying tubes 120 and 121. In this form the grid transformer 56 has one end of its secondary 55 connected to the grid 118 by the lead 122 and the other end connected to the grid 119 by the lead 123. The reversing switch 16 and the dynamic braking contacts 17 and 18 operate as discussed in connection with the embodiment illustrated in Fig. 1. This form of control somewhat decreases the power factor due to wave-form distortion, yet it retains all of the other advantages of the embodiment illustrated in Fig. 1.

"The current limiting device illustrated in Fig. 6 is of a slightly different arrangment than that used in Figs. 1, 4, and 5. In this form the lever 166 is pivoted about a fulcrum 160. At one end thereof it has an iron core 165 adapted to move into or out of the solenoid 138, through which the armature and series field current of the motor passes. Resistance to the pull of the current in solenoid 138 is provided by the tension of a spring 164, which spring is fastened to a fixed member 170 by some adjustable means, as for example a wing nut 171. At this same end of the lever there is a member 172 having a shoulder 173 and a narrow portion 174. This narrow portion is slidably splined in an opening 175 in a bar 176 which is supported by springs 177. The bar 176 has at each end thereof iron cores 178 and 179 which are adapted for movement into or out of the coils 180 and 181, respectively. These two coils are connected in series and together from the inductance branch of the phase splitting circuit.

"It may be seen that, as is also the case in the structure used in Figs. 1, 4, and 5, the lever 166 is free to move a certain amount before altering the position of the cores 178 and 179 in the coils 180 and 181. Thus provision is made for a certain amount of current changes through the solenoid 138 without any limiting effect, yet when the current rises above the desired value the shoulder 173 comes into contact with the bar 176, forces the cores further into the coils, and thus prevents too large a current. Through the use of a lost motion connection in connection with the current control means control of the motor through independent conventional control means may be used, if so desired, while retaining the advantages of a current limiting device to prevent overload currents from damaging the motor, and to completely prevent surges, as for example when the motor is reversed."

Claims 9, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 25 and 26 of this patent are in suit. Counsel for the plaintiffs, however, has stated that Claims 13, 17 and 20 are typical and that no other claims need particularly be considered. The last mentioned claims are as follows:

"13. Method of operating a compound wound direct current motor having an armature winding and a series field winding connected in series, and a separate shunt field winding, which comprises impressing unidirectional impulses of potential at a given frequency upon the terminals of the armature and series field winding, impressing upon the shunt field winding unidirectional impulses of potential at the same given frequency, but out of phase with the impulses impressed on said armature and series field, and, as said armature accelerates, reducing the phase difference between the two sets of impulses."

"17. In combination, an alternating current supply circuit, a direct current motor comprising a first circuit having a series type field winding and armature in series, a second circuit comprising a shunt type field winding, a first rectifier comprising a controlled rectifier tube having a control electrode, means for synchronously exciting said electrode to determine the period during the wave that said tube is conductive, said tube being connected to said first circuit, a regulator sensitive to current flow in said first circuit for shifting the phase of excitation of said electrode, and a second rectifier for supplying rectified current to said second circuit, said rectifiers being supplied with alternating potential from said supply circuit."

"20. In a motor control system, a source of alternating current potential, a direct current motor having a separately excited field winding circuit, a rectifier excited from said source for supplying unidirectional current to said field winding circuit, said motor having an armature and series field winding circuit, a rectifier excited from said source for supplying unidirectional current to said series field winding and armature circuit, and regulating means sensitive to the effective unidirectional current flow in said field winding and armature circuit for automatically limiting the current flow through said latter rectifier and field winding and armature circuit to a predetermined value."

118

The word "thyratron" comes from a Greek word meaning "a door." The thyratron is a three-electrode tube, into which, after exhaust, a small amount of inert gas has been introduced. The thyratron consists of a cathode, grid, anode, and a small amount of inert gas. The presence of the gas changes the pure electron discharge into an arc, so that the thyratron is an electrostatically controlled arc rectifier. The thyratron is an arc rectifier, the starting of which can be controlled by a grid. After starting, the grid has no further control over the arc. It may repeat the starting operation because, although the arc cannot be extinguished by the grid, it can be extinguished by removing the anode voltage. Upon reapplying this voltage, the grid again determines whether the arc will start. By continued repetition of this process it is obvious that the grid can control the average current, and it is further obvious that the averaging can be made as "fine-grained" as desired by increasing the frequency of interruption. A simple method of obtaining interruptions is to use alternating anode voltage. The foregoing statements, relating to thyratrons, are taken from an article entitled "Hot-cathode Thyratrons" by Dr. Albert W. Hull, of the research laboratory of the General Electric Company, which was published in the issues of "General Electric Review" of April, 1929, and July, 1929.

The word "Thy-mo-trol" is a trade name used by the General Electric Company to indicate electric circuits designed by it and employing thyratrons.

In considering the questions of infringement and validity of the Young patents, it should continually be borne in mind that Young was not, and in fact did not claim to be, the inventor of the thyratron. Young testified that one Haug and one Plaisance, both of whom will be referred to hereafter, handed to him a copy of the reprint of the article by Hull. Young said that this was his first knowledge of thyratron tubes. The reprint of the Hull article had been procured by Haug and Plaisance from the Chicago office of the General Electric Company. Young's story is to the effect that, after the Hull article came to his attention, the thought occurred to him that the thyratron tube might be used to control the flow of electric current to motors and that this thought was developed by him and the resulting development was disclosed to the world by the two patents in suit.

The devices of the defendant, which are charged to infringe, are the so-called "Integral horse power Thy-mo-trol" and the so-called "Fractional horse power Thy-mo-trol."

An elementary diagram of the circuits of the defendant's integral horse power Thy-mo-trol was introduced in evidence, and a copy thereof is next hereinafter set forth:

ELEMENTARY DIAGRAM
CR-7507-I02A2 THY-MOTROL

GENERAL ELECTRIC
P-8291935

120

A description of said integral horse power Thy-mo-trol, which appears in plaintiffs' trial brief, is set forth in the marginal Note 1.

A more complete description is included in the testimony of Orrin William Livingston, who is employed by the defendant as consulting engineer for its Electronics and Regulator Control Engineering Division, and who, with two other employees of the defendant, developed the circuits of the integral horse power Thy-mo-trol and who apparently knows more about thyratrons and their uses than any of the other witnesses on either side of the case. The portion of Mr. Livingston's testimony wherein he describes his integral horse power Thy-mo-trol is set forth in the marginal Note 2.

Note 1.

Integral Horse Power Thy-mo-trol, as described by Counsel for Plaintiffs:

"Sometimes it is called the 'Integral Thy-mo-trol' device, as it generally is used to control motors of one horse power or more. The Thyratron tubes are numbered Tube 1 and Tube 2 in the upper portion of the diagram. The motor and its fields are directly in the center of the diagram and are labeled 'Arm.', 'Series Field' and 'Shunt Fld.'. The phase shifting bridge is shown at the right slightly above the center. In this phase shifting bridge the resistance is labeled R5, the reactance device is a saturable core reactor labeled SR. The phase shift is applied to the grids of the Thyratrons through the transformer primary T2P at the right and the transformer secondary T2S appearing to the right of Tube 1 and the left of Tube 2. The saturable core reactor functions in this fashion. It has an A. C. winding supplied with A. C. current of constant voltage. It has two iron legs or iron cores wound with a direct current winding. If no direct current is flowing through the direct current winding, the magnetic flux of the A. C. winding is concentrated in the iron cores and the reactance of the device is at its maximum. This produces the maximum phase shift applied to the grids, and the Thyratron tubes are turned off for substantially the entire cycle. When the current flows through the D. C. windings the D. C. current saturates the iron cores. The A. C. flux then cannot flow through the cores but is dispersed through the air so the reactance from the A. C. windings is decreased. When the reactance is decreased, the phase shift applied to the grids is reduced. This allows the Thyratron tubes to fire earlier in the cycle and thus pass more current. Thus it can be seen that by varying the amount of current in the D. C. winding, the amount of the reactance of the A. C. winding is varied. The net effect of varying the D. C. current is as though the amount of iron in the iron cores were varied.

When the D. C. current is increased and the iron is saturated, it is as though the iron cores were withdrawn from the A. C. windings. Conversely, when the D. C. current is decreased and less of the iron is saturated, it is as though more iron were inserted into the A. C. windings resulting in an increase in the reactance and an increase in the resulting phase shift.

"Instead of using a solenoid coil in series with the armature as does the device of Figure 6 of Young patent 2086594, the GE integral horse power Thy-mo-trol uses the two coils T4P which appear in the diagram about Tube 1 and Tube 2. All the current flowing through the armature also flows through the two coils T4P and thus together the coils are in series relation with the motor just as is the solenoid in the Young device. The signal or magnetic impulse from the winding T4P is applied to the secondary transformer winding T4S appearing at the right side below the center of the diagram and is *modified* through the two tubes labeled Tube A to vary the amount of current flowing through the D. C. winding of the saturable core reactor labeled 'SR–D. C. winding.' The D. C. winding of the saturable core reactor is shown at the lower left of the diagram. The D. C. winding is also shown as part of the entire saturable core reactor in the phase shifting bridge in the upper right portion of the diagram. An increase in the current through the coils T4P results in a decrease in the current through the D. C. winding of the saturable core reactor which increases the phase shift applied to the grids which in turn limits the current flowing through the tubes to the motor."

Note 2.

Testimony of Mr. Orrin William Livingston, a witness on behalf of the defendant, in respect of defendant's integral horse power Thy-mo-trol and the circuits thereof, as shown by an elementary diagram in evidence as Plaintiffs' Exhibit 77:

"Direct Examination by Mr. Walker:

"Q. Now, Mr. Livingston, having put Plaintiffs' Exhibit 77 on the easel, I wish you would explain its operation to the court, and I suggest that you address yourself first to the main power supply and then to the—well, you can choose yourself whether you take up speed control or current limit.

\* \* \* \* \* \* \*

"A. This equipment consists essentially of a controlled rectifier, which has an anode transformer, the primary of which is not shown, the secondary of which is shown as T1S, and as a pair of tubes, tube 1 and tube 2, which are grid controlled tubes or thyratrons, which supply the motor armature terminals A1 and A2, through an overload relay, a series field, and the circuit is completed to the mid tap of the transformer. That is the power circuit of the armature circuit.

"It also includes a series field and commutating field, if they are present.

"The same anode transformer acts as the anode transformer which supplies the voltage for the field, and the two field tubes are tubes 3 and 4 and are the uncontrolled variety, which supply a constant excitation or constant voltage, which supplies the shunt field between the terminals A1 and also supplies power which will be used to operate the control unit, which is located in the lower part of the diagram.

"Now, the method of phase control of the grid controlled tubes, tubes 1 and 2, the armature tubes, is through the grid transformer T2, the primary of which is located on the section of the diagram to the upper right, and it is located in a phase shifting circuit which consists of a saturable reactor SR and a resistance R5.

"The saturating winding of the saturable reactor 9 and 10 is duplicated in the lower diagram and is connected in series with the tube A. Its operation will be explained later. Now, the arrangement of this lower unit which controls the saturation of the saturable reactor and consequently the phase position of the grid voltage and the firing point of the tubes will be explained.

"Perhaps I should first add—I wanted to call your attention to the transformer T4 which has a primary in series with the anode of both tube 1 and tube 2, and which has a secondary located in the lower central sector, about in the middle of the drawing, and the secondary is fed through a rectifier tube B, to produce a DC voltage from 31 to 17. Now I will attempt to go through the operation of the control circuit, and I will first explain—

"Q. Before you do, Mr. Livingston, I think it might be helpful to the court if you would turn to the chart on the other easel—

"By Mr. Walker: (Continuing)—which is the same circuit, in substance, your Honor, in our standardized simplified arrangement, so that you can relate this to the prior art devices and other devices which have been pictured to you, and that is at tab 13 of our supplemental chart book.

"A. In this diagram, we can note these same devices,—the anode transformer, located in the central portion; the main rectifier tubes in the central portion, feeding the armature of the motor, which is located on the lower right; the rectifier which supplies the field—that is, the two tubes are connected in the upper right hand section and feed the field at 10b. The phase shifting circuit is shown at the extreme left and consists of the saturable reactor and resistor, and the saturation of the saturable reactor is controlled by means of a tube here indicated as 55, which corresponds in function to the tube A on the left hand side in the original drawing. Now, going back to the Exhibit 77, I shall describe the general location of these tubes with respect to each other. We find that the field voltage—that is, the voltage which is used to supply the shunt field—is filtered through a reactance, indicated as X, and then supplied,—and also a capacitator C 5, which tends to filter and make the output more constant—and then supplied through a resistor R 7 and through two glow tubes which are indicated as tubes C and D. These glow tubes have the property of, over an operating current, of maintaining essentially constant voltage across their terminals, and consequently serve as a source of reference supply which remains essentially constant, in spite of variations of power supply.

"Now, you note that these tubes also maintain line 3 at a constant potential and the line 1 at a constant potential.

"Now, I will trace through the various tubes in this particular arrangement. We note that the saturable reactor tube, which is tube A, receives its anode voltage from a potential, which is 10. That is more positive than its cathode, which is located on 3; and the current— if the grid of this tube is sufficiently positive, or insufficiently negative, current may flow through this tube, through the saturable reactor winding SR, and that, of course, tends in turn by shifting, advancing the phase of the grid voltage which is applied to the grids of these thyratrons, tends to advance the point

in the cycle at which the thyratrons fire, and so tends to increase the output of the rectifier; so increase in current in the saturable reactor increases the output of the rectifier.

"Now, this amplifier tube here, this tube A to the left—

"Q. You spoke of tube A. It was the left hand one of two tubes that are so indicated? A. It was A, and the left hand tube A is the tube which directly controls the saturable reactor.

"Now, the grid circuit of tube A involves the resistors; it involves a potentiometer, which consists of resistors R 8, R 9 and R 10, and as tube B passes current or as the tube A right hand side passes current, that causes additional current to flow in resistor R 8, which lowers the potential of the point 28, correspondingly the potential of 32, which effectively causes tube A, left hand side, to pass less current, which causes the tubes eventually to be turned off.

\* \* \* \* \* \* \*

"Now, the tube B will be what we call the speed tube, and tube A to the right will be the current limit tube, and I will first explain tube B, the speed tube, and how it functions.

"We notice that the grid voltage of tube B consists of a portion of the voltage on the potentiometer, some place between the position of the slider and the point 1; and, tracing down the grid circuit, we note that that tends to make the cathode positive with respect to the line 1. We also can trace the grid circuit of this tube B over to a potentiometer which is called R 34, and that potentiometer receives its excitation from one side of the armature of the motor, and consequently the voltage from the slider down to this bus 1—assuming for a moment that we turn this IR drop compensating resistor R 32 to zero—under those conditions the potential of R 7 to the bus will be proportional to the armature voltage.

"Now, if the motor's armature voltage for some reason were to be so high that the proportion of it which is selected by R 7 causes the grid of tube B to be more positive than the cathode of tube B— that would turn tube B on, and that in turn would turn tube A to the left off, and that would phase retard the thyratrons, which would actually reduce the voltage on the armature, which would then tend to remedy that situation.

"So that we find that under equilibrium conditions the voltage of the armature is in effect regulated, so that the voltage of the grid, of the tube B is slightly negative with respect to its cathode, so

that it passes just enough current so that the potential of the grid of tube A is just right to pass enough current through the saturable reactor to maintain the proper phase to maintain that voltage.

"This is a feedback system. In other words, we are comparing on the grid of this tube two voltages, one a reference voltage from the slider of the potentiometer down to the line 1, and the other a feedback voltage from the line 1 to the slider of the potentiometer R34, which is the armature voltage; and we attempt to make the difference of that zero, and any great change in that difference causes a change in the grid, which tends to correct that error which was produced by some cause such as line voltage or some other means.

"Q. Mr. Livingston, in your explanation of the operation of the two parts of tube A and tube B, I am not sure that you mentioned what kind of tubes they are and how they act. A. Sorry. Tube A and tube B, actually there are two parts of tube A and there are two parts of tube B. They are both high-vacuum tubes. They are not of the gaseous type, and consequently the output—the current flowing through such a tube as tube A may be continuously controlled by changing of the potential of the grid. That is in direct distinction to a gaseous type of tube, in which the conduction is either complete or not at all.

"Q. The conduction in a high vacuum tube, such as both tube A and the lower part of tube B, is proportional to the grid voltage, is it? A. It is a function of the grid voltage. It is also a function of the anode voltage and other things. But it is a function of the grid voltage.

"Q. Would you continue with your explanation? A. Now, I have attempted to show you how the tube B operates to regulate the armature voltage. That is, any increase in armature voltage tends to cause a chain of reactions which decreases it. Any decrease will be met by a chain of reactions, through these amplifier tubes, through the saturable reactor, through the phase shift and through the thyratrons, in such a manner that once having set this slider at a given value, that will attempt to hold the armature voltage substantially proportional to that value.

"Q. What is the purpose of holding the armature voltage in that situation? A. The purpose of that is to lower—we realize that the speed of the motor is approximately equal to the armature

voltage, and in holding the armature voltage constant we are holding the speed approximately constant.

"Q. That is the point—A. That is the purpose.

"Q. That is the point of being concerned with that voltage, is it not? A. That is right.

"Q. The relationship which it bears to speed? A. That is right.

"Now, then, that arrangement, however, is not accurate enough; that is, as load is applied to a motor and the voltage held constant on the armature, we realize the speed actually does decrease. One of the factors which causes it to decrease is the armature resistance, and this circuit is equipped with an arrangement which we call an IR drop compensation, which is obtained through this potentiometer R32, which allows us to regulate the armature at a higher voltage, or will cause the armature to be regulated at a higher voltage as the current increases; so, in fact, as to attempt to cause the counter-e.m.f. to remain constant. Perhaps an example of what I mean would be something like this: If we were regulating a machine which had one ampere current through it, and it had a ten-ohm armature and the terminal voltage was 110 volts, under those conditions the one ampere times the ten ohms would indicate the counter-e.m.f. was 100 volts, which would be indicative of speed. If now we increase the current to 2 amperes and attempted to hold the terminal voltage at 110, actually the counter-e.m.f. would only be 90, which would mean that the speed had gone down. However, if we introduce a correction which permits us to regulate the terminal voltage at 120 volts, under the two-ampere condition, this would actually keep the counter-e.m.f. at 100 volts. Now, this is accomplished in this circuit by means of the current transformer, which I mentioned previously, T4; the secondary of that current transformer is rectified; the voltage on the secondary is rectified by the tube B, the righthand section, and the voltage is impressed across a circuit consisting of resistance R33, R21 and R32. That means that as the current increases, this voltage also increases, and so we can see that as the current increases, the point 17, which is the bottom end of the potentiometer, becomes more negative with respect to the point 1, and if we move the slider part way down on this potentiometer, we find that the potential of the slider is made more negative as the current increases. Now, the effect of that, since the bottom end of the potentiome-

ter, which is connected from one side of the armature at 13 and goes through the resistor R15, the potentiometer R34 and the resistor R14, since one side of that is connected to the slider of this potentiometer R32, we find that an increase in current tends in itself to lower the potential of the slider of the potentiometer R34, and that action requires the armature voltage to increase in order to again bring the potential of that slider which is marked R7, which is also the grid of the left hand section of tube B, back to its former value.

"Just to recapitulate briefly, as the current increases, the lower end of this potentiometer is made more negative, and in order to maintain the same potential at the grid point, the upper end must be raised, and consequently that means that the voltage at which the armature is regulated is automatically increased as the current drawn by the armature circuit is increased, and that is adjustable— since this is a slider—and we may adjust it, in a motor, for example, at 5-volt or 10-volt or 15-volt rise, from no load to full load, depending upon how much armature resistance or how much increase in terminal voltage is necessary in order that the motor maintain essentially constant speed from no load to full load. Now, that describes the speed regulating function. I have also mentioned the fact that the right hand section of tube A has a current regulating function.

"Q. Are you going now to describe that part of the circuit which is effective to limit the current in the armature? A. That is correct.

"Q. Good. A. In the current regulating circuit, I again would like to point out that the grid voltage on this right hand section of tube A is composed of two parts: one, a reference voltage, which is a voltage from the cathode down to the bus 1; in other words, it is a negative voltage of about 105 volts, I believe, something of that sort; and the other component of the grid voltage is the voltage drop across the resistors R21, and that section of the potentiometer R33 up to the slider 26, which is used. In other words, we have a turn-off voltage which is a reference voltage, and we have a turn-on voltage from 1 up to 26, which is proportional to the—

"Q. The turn-off voltage you indicated is the drop across the lower of the glow tubes? A. Yes, and the turn-on is the drop across a portion of the resistance in the current circuit. Now, then, under normal conditions of lower than rated current, we find that the voltage drop or the voltage signal from 1 to 26,

which is essentially the grid potential of the tube E, is actually smaller than the voltage across the glow tube from 3 to 1, and as the result the tube, the grid of the tube, right hand section of tube A, is sufficiently negative so that the tube passes no current and has no effect upon this potentiometer and does not interfere with the operation of the tube, the left hand section of tube A, as commanded by the left hand section of tube B. However, if the current increases beyond a certain value, we find that the potential of point 26 rises so that— that is to say, the voltage from 26 to 1 exceeds the voltage from 3 to 1, and we actually tend to make the grid of the right hand section of tube A—well, let's say, less negative or more positive—and we find that we reach a point where tube A, right hand section, begins to pass current, and as it passes current it causes current to flow through the resistor R8 and causes the point 28 to drop in potential, consequently the point 32 to drop in potential, and consequently it tends to turn the left hand section of tube A off; and the effect of that is to decrease the saturable reactor current and eventually, through a chain of operations, to phase retard the tubes. So that the excessive current which originally caused this thing will be restored or held down to a definite predetermined value by means of reducing the voltage by the phase controlled rectifier. So that we basically then have—that is, the function of this right hand section of tube A, then, is to take over, that is, to interfere, and you should note that the operation of tube B can do nothing to interfere with the operation of tube A. Once tube A starts to pass current, it is effective in reducing the current through the left hand section of tube A, regardless of what tube B can do.

"Q. Just for the record, Mr. Livingston, the thing you said tube B was powerless to effect is not just tube A, generally, but the right hand part of tube A; is that correct? A. It is powerless to effect the left hand portion of tube A.

"Q. Yes. Thank you. A. So that you see the current limit takes precedence over—when it causes the current to reduce in the left hand section of tube A, it takes precedence over anything that the speed tube can attempt to do, and that explains why the characteristics which we illustrated this morning showed a varied—when we reached 12 amperes, or thereabouts, the speed decreased very rapidly, and the current limit tube effectively took over the control very quickly.

"Now, I think that very briefly gives you the two basic functions of the circuit—the voltage regulation, with the IR drop compensation, and the current limit arrangement.

"Q. Now would you please explain to the court the functioning of this apparatus when it is started from a standing start? A. Yes.

"Q. With particular reference to the manner in which the current through the armature of the motor will behave. A. Yes. When this equipment is in its standby position—I won't go through all the details of this magnetic circuit, but I will indicate that these contacts indicated by LE, located in the anode circuit of the two tubes 1 and 2, will be open, so that there will be no voltage applied to the armature. I will also point out that the contacts marked LE, with a line drawn through them, which indicates that it is back contact, will be made. In other words, this circuit is what we call a normally closed contact, and when the relays are deenergized, that circuit will be made so that under standby operation we find that we have a connection from the grid of tube A, righthand side, through the resistor R17, which is paralleled by the condenser C14, through the LE contact normally closed, to the point 7, which is at a positive potential with respect to the cathode of tube A, righthand side. Now, the effect of that is that it tends to turn the tube A, righthand side, on during that standby operation; and, turning the righthand side of tube A on, turns the lefthand side of tube A off, decreases the saturable reactor current, which retards the phase, and so the phase of the grids of these thyratrons is basically phased in the fully retarded position. So that when the contact— when the button is pressed to start over here, that, as you see, picks up LE, which closes these contacts here, and opens these contacts—closes the contacts in the anode circuit and opens the sealing contact in what we have come to call a preconditioning circuit; and that opening of that preconditioning circuit permits the voltage on the grid of this righthand section of tube A to start to decrease or to move in a negative direction, as would be required by the actual potential of point 24, because, you see, we have no current flowing through the tube, and therefore the voltage from 26 to 1 would be essentially zero. However, that grid voltage does not come down instantly, because it is delayed in the rate at which it comes down by a circuit, consisting of a resistor R11 and a capacitor C6, so that it comes down at a definite determinable rate, and as it

gets within certain limits, we find that tube A starts—

"Q. Tube A, righthand? A. Tube A, righthand half—(continuing) starts to decrease its current, we shall find that the current. It is not an abrupt thing, but gradual, and as it does increase its current, it increases the current through the saturable reactor and the phase, as a result, starts to advance and does turn the tubes 1 and 2 on, which then starts to pass current; current then flows through the primary of transformer 4 and the secondary of that produces a voltage which is rectified by tube B, and that then does produce a voltage between 26 and 1, and as that voltage increases, as the current increases, it finally reaches a value approximately equal to the current limit reference which is the voltage from 3 to 1, and we find that this tube—that is, the righthand section of tube A—has assumed control gently and, in other words, the inrush of current has not been too abrupt; it has been cushioned, and may be cushioned to any reasonably desired value, by the adjustment of this R11–C8, so that the current builds up to the current limit, and then we find the tube A, righthand section, in command of the situation, limiting current, and the motor is accelerating.

"Q. Mr. Livingston, I know you have included it in that excellent answer, but it is so interwoven with the description of the functions of the different components, that I wish you would, without interjecting anything about what tube does what, just state what the voltage waves will be which pass through the controlled rectifier tubes of this apparatus, starting with the first half cycle after the start button is pushed and continuing for as many half cycles as may be necessary to complete the description in that regard. A. The first half cycle after the push button is depressed, the voltage waves passed by the tubes 1 and 2, will be extremely small sections at the rear end of a sine wave of anode voltage. In other words, it might start firing 10 degrees, 20 degrees, before the end of the cycle, and as the motor continues to accelerate we will increase—that is, the point of firing will come earlier in the cycle, until the required speed is reached.

"Q. Would you illustrate by operation of this animated chart, Exhibit 102, what will occur to the voltage waves in the output circuit of the thyratrons in Defendant's Thy-mo-trol, represented by Exhibit 77, when that circuit is started in operation by pushing the starting·button, describing, as you do, what you are doing to the handle, as well as what re-

sult occurs? A. When the contacts are initially closed LE and the sealing contact broken, we will probably find that the phase shift has been initially set to some condition, perhaps as I have shown—

"Q. And what you have shown is a phase relationship between the grid voltage and the anode voltage such that the tubes are firing at a very late point in the half cycles? A. That is correct, and the current which flows as the result of that late conduction is generally substantially less than the current to which you have to limit the current, for reasons of protection of the equipment. Now, as the potential—

"Q. Mr. Livingston, please let us not care about what causes it, because I think that does now appear on the record; just describe what the resulting voltage experience is in that motor circuit and the current experience. A. This indicates that the current will start flowing at the point where the shadow is shown and the current actually will continue flowing somewhat after the zero point, and we do also get a negative section of voltage, due to the inductance.

"Q. Perhaps I have unnecessarily complicated this by speaking in terms of current. Let's talk about what the voltage will be in the armature circuit during the first few half cycles after the starting button is pushed. On the first half cycle, it will be what appears on the animated chart now, with the phase retarded as the chart will take it; is that right? A. Not exactly.

"Q. All right. You straighten it out. A. I would like to add the fact that, due to the inductance of the circuit, there will definitely be a tail in there, and as this—however, it may be of small significance, if the inductance is small, or it may be of considerable significance, and as the current through the saturable reactor increases, the point at which the firing occurs will progress earlier in the cycle and the voltage wave shape impressed on the armature will look like this shadow, again with the possibility of a tail on the negative side.

"Q. Now, that tail is simply a phenomenon which occurs because of such inductance as the circuit has A. That is correct.

"Q. And what is shown on this animated chart is the kind of voltage wave that would occur if the load were purely resistive in its character? A. Yes.

"Q. And is this the situation, Mr. Livingston: that as this circuit of Plaintiff's Exhibit 77 is put into operation by the pushing of the starting button, that the voltage wave in the output of those thy-

An elementary diagram of the circuits of defendant's fractional horse power Thy-mo-trol is next hereinafter set forth:

A more complete description is included in the testimony of Mr. Livingston. The portion of Mr. Livingston's testimony

**NON - REVERSING**

A description of said fractional horse power Thy-mo-trol, which appears in plaintiffs' trial brief, is set forth in the marginal Note 3.

wherein he describes the fractional horse power Thy-mo-trol is set forth in the marginal Note 4.

ratrons will start from a very small wave, representing a very small part of the full voltage wave impressed upon the circuit, and will gradually increase, as is done when I move the handle of this device in a counter-clockwise direction, until the voltage impressed upon the output circuit has reached a value which will produce a current which will cause the current limiting part of the circuit to

prevent further increase in the firing time? A. That is correct.

"Q. Subject always to your addendum that actually, because of the inductive nature of the load, there will be a little tail in the voltage curve? A. Yes."

\* \* \* \* \* \* \*

"Yesterday you identified yourself as one of three persons on whose applica-

tion a patent was issued to General Electric Company relating to this integral Thy-mo-trol circuit.

"Is this the patent, No. 2,312,117, issued February 23, 1943, on an application filed April 23, 1942, on application of Elmo E. Moyer, Orrin W. Livingston and Henry H. Leigh? A. Yes."

Note 3.

Fractional Horse Power Thy-mo-trol, as described by Counsel for Plaintiffs:

"The second device manufactured by the defendant which the plaintiffs claim infringes the two Young patents is sometimes referred to as the 'Fractional Horse Power' device. * * * This device does not use a saturable core reactor or phase shift bridge, but applies a fixed A. C. phase shift lag of about 90 degrees to the grids of the Thyratron tubes by means of the condensers 1C and 4C and the resistors 3R and 4R. This fixed 90 degree phase shift is made to fire the tube at different times by means of a varying D. C. potential that consists of two components, one of which is applied through Tube 4 and the other of which is applied through Tube 6B. This D. C. potential varies in magnitude in response to the transformer coils 2TP in series with the flow of current through the series field and armature of the motor. The signal from the windings 2TP is modified through tubes 5A and 6B. As the current increases through the windings 2TP the grid of Tube 6B is made more positive. Tube 6B then passes more current and in effect shifts the point of intersection of the voltage applied to the grid with the critical grid voltage curve of the Thyratron tubes, thus turning off the tubes earlier in the cycle and limiting the current flowing through Tube 1 and Tube 2 to the armature and series field of the motor. * * * As the D. C. bias is varied by action of Tube 6B the A. C. wave is in effect moved up or down to intersect the critical grid voltage curve of the Thyratron tubes at different points, thus changing the time of firing of the tubes and limiting the current to a safe value."

Note 4.

Testimony of Mr. Orrin William Livingston, a witness on behalf of the defendant, in respect of defendant's fractional horse power Thy-mo-trol and the circuits thereof as shown by an elementary diagram in evidence as Plaintiffs' Exhibit 84:

"Direct Examination by Mr. Walker:

"Q. I have put up on the other easel, Mr. Livingston, the chart which is Plaintiffs' Exhibit 84, from which the explanation of this fractional horse power circuit was made during plaintiffs' case, and I think for that reason, and because the preconditioning circuit is shown on this Plaintiffs' Exhibit 84, and that preconditioning circuit is not on the simplified chart, perhaps you should use Exhibit 84 as the basis for your explanation. A. Yes. Again, the equipment consists of a controlled rectifier, energized by a transformer in the center, the two tubes 1 and 2, grid controlled rectifier tubes, which supply through the over-load relay and through the contactors, forward and reverse, the armature of the motor and the commutating field, and series field, if used, back again to the transformer.

"Q. To make sure the reporter got that, I think you said 'if used'? A. In this particular case, I notice that the diagram simply says 'Series field.' If such a series field were not present, of course, the user would just simply jumper those two points together.

"BY MR. WALKER: At that point, just to remind the court, and relate this to Mr. Goss' testimony, his testimony was that from 1944 to 1948 about 20 per cent of the motors supplied for use with this circuit were pure shunt motors; the other 80 per cent were compound motors, that is, had a series field in them; and that as of sometime, I think it was late in 1948, a decision was made to drop the series field altogether, and that between that time and sometime early this year they used up the supply of compound motors, and from early this year on there has been nothing but pure shunt motors, which under Plaintiffs' claim here are not charged to be infringements. If there is a series field, which makes no difference in the operation, then they are charged to be infringements.

"Q. Please go ahead Mr. Livingston. A. The field of the motor is supplied from the same transformer, through the rectifier tube labeled No. 3. The shunt field is shown in the lower left hand corner. The voltage supplied to the shunt field is also used as a source of DC voltage for the control circuit which is located generally in the center lower portion of the diagram. The method of phase control used in the armature is a modification of the 90 degree lagging AC component plus DC system, which I described previously with the slide that Mr. Walker has in his hand.

"By Mr. Walker: And which is Defendant's Exhibit 113.

"By the Witness: A. (Continuing) That is the basic scheme. This is a modification of it. I will just very crudely, rapidly, go through this, to illustrate

how that is accomplished. We will note that there is a transformer, of which the secondary is 4TS, 4 transformer secondary, and that transformer is in a circuit which I will trace, from the lead X1 of the transformer, through the resistor 3R, through the condensor 1C, to the cathode bus 31, through the cathode bus 31, through the capacitor 4C, through the capacitor 4C to the resistor 4R, and back again to the other terminal, the X2 terminal, that is, of the transformer.

"By. Mr. Walker: 4TS.

"By the Witness: 4TS. That circuit is so designed that the resistance predominates over the capacity reactance. So that the current flow is limited largely by the resistance, which means that the current is essentially in phase with the voltage, and the voltage, incidentally, is in phase with the anode voltage since it is obtained from the same supply. Now, it is a fact known to electrical engineering that the voltage across a capacitor leads the current through a capacitor. It is more generally thought of the other way, in which they say that the current through a capacitor leads the voltage. But I am saying the same thing backwords.

"By Mr. Walker: Excuse me, Mr. Livingston. Perhaps you misspoke, because you appeared to say the same thing, whichever way you said it. Would you please read the answer Mrs. Cochran, and see if the witness misspoke. (Record read).

"By Mr. Walker: That is, you said 'leads' both times.

"By the Witness: I am afraid I was confused. A. To straighten out that situation, the voltage across the capacitor actually lags the current in this circuit, and the current in this circuit was in phase with the anode voltage. So that means that the AC component of voltage across the capacitor 1C lags the anode voltage of the tube 1, and in a similar manner the voltage across the capacitor 4C lags the anode voltage of the tube 2 by 90 degrees. That is to say—

"By Mr. Walker: Q. You didn't mention the amount of lag with reference to the voltage across the capacitor 1C. Was that also 90 degrees? A. Yes, the voltage across both of these capacitors 1C and 4C lag by approximately 90 degrees their respective anode voltages. Now then, if we had no further connection to this circuit of tubes such as tube 4 and tube 6A, we would simply have an AC voltage lagging approximately 90 degrees and both tubes would be turned approx-

imately half way on. However, if we can devise some scheme of moving—

"Q. Would that be represented by moving the slider on Exhibit 113 to a position in which the horizontal line on the slider was about even with the bottom of the critical grid voltage curve? A. Yes, or possibly a little bit higher than that, that is, if we actually had zero. It would be in that neighborhood. Now, again, we find that we do have two tubes here. The tube 4, which is the diode, that is, it is a tube which only has an anode and cathode, and it has the possibility of passing current from the anode to the cathode, if that tube alone were placed in the circuit, and tube 6A were eliminated, we would find that this would have the effect of passing a current—in other words, whenever the point, the cathode point became more negative than the bus 31, we would tend to pass a DC current through this tube (indicating), that is, a unidirectional current, and its effect would be to charge these condensers 4C and 1C, and it would actually attempt to place a DC potential on both of those condensers, and the direction would be such as to make the grids more positive, that is, it would place a DC potential or a turn-on potential on both grids, and that would be very similar to moving the slide up above the axis, in that fashion (indicating). Now, the direction in which this second tube 6A operates, it is so connected that its effect will be to make the DC component of voltage on the condensers 1C and 4C more negative, so that the effect will be to move the slider down.

"Q. And that resulting effect upon the firing time? A. And the resulting effect to retard the firing point. So that we can very crudely call these tubes short names, and we say this is a turn-on tube (indicating)—

"Q. Please name them. A. This is tube No. 4, which is the diode, that we sometimes refer to as the turn-on tube, and tube 6A as the turn-off tube. Now, the tube 6A is also sometimes called the speed tube, and it is connected in the circuit with a reference voltage and a feed back voltage from the armature, in the same manner as was illustrated yesterday on the integral horsepower. So I will just very, very briefly indicate how those voltages are added in the circuit. Starting with the cathode, we may go over to the right and we pick up a voltage from the slider of the potentiometer 3P, down to the bus 6, which is called the speed reference voltage, and its effect is to raise the cathode. Then, trac-

ing through the circuit from 1P, the top connection, down to the slider, we pick up a signal, which is the IR drop compensation, and then we pick up, going upwards through the resistor 14, to the slider of the potentiometer 1P, we add in a voltage which is indicative of the armature voltage. You see, the top of the resistor 13R is connected under one side of the armature of the motor through the connection, through 77, and through the contactors; and, of course, the slider of that potentiometer 2P is connected to the grid of the tube 6A. Therefore, the tube 6A has two voltages, or actually three, a speed reference voltage, an IR drop compensation, and an armature voltage signal. The latter two can be combined and are essentially a speed feed-back signal. Now, if the armature voltage or the speed should be too high—in other words, that means that the grid of this tube 6A is made too positive, the effect will be to turn the tube 6A on more strongly, and as I explained before its effect is to make the DC components on these condensers more negative and to move the slider down. In other words, it is the turn-off tube, and the effect then is to retard the phase of these tubes 1 and 2, and that of course reduces the voltage supply to the motor, and consequently that tendency to run too fast is corrected. Now, then, I have explained the speed function. Now, we also have a current function; that is, a current limit. We note that the tube 6B is connected in the circuit in a very similar manner that the tube 6A is connected. However, in this case the voltages supplied in the grid are as follows: We pick up a voltage from the cathode down to the bus 6, which is a fixed value determined—since it's a proportion of the voltage used to excite the field—and that is a reference voltage which is going to be used as a current reference. Then moving over to the right, on the 6 bus we pick up another voltage across the resistor 9R and the potentiometer 4P from the bottom connection to the slider, and that voltage across that section is proportional to the current, since we have a current transformer 2P in this circuit, and is rectified in the same manner that we had on the integral horse power; so that this tube then has in its grid circuit a reference voltage and a current signal.

"Q. When you said 'this tube,' Mr. Livingston—A. This tube, 6B has in its grid circuit a reference voltage and a current signal.

"Q. Excuse me. The reference voltage between the points so and so, please, for the record. A. Between the points 45 and 6 and a current signal between the points 6 and 49A. If the current is below a certain predetermined value, we find that the voltage between 49A and 7 will be sufficiently small that the tube 6B will be non-conducting and the control will be solely dependent upon the operation of the tube 6A. As the current increased, the voltage of the point 49A rises until finally the tube 6B becomes conductive, and its conduction causes the grid phase to be retarded, just as the voltage tube was described as limiting the phase previously, and the tube 6B then has the effect of retarding the grid phase in spite of any action of the tube 6A. So that we again get a current limit in a similar fashion to that which we had in the integral Thy-mo-trol.

"Q. That is, the speed tube 6A controls the speed in all situations, except where the current drawn would be above a predetermined value, in which event the tube 6B takes over and prevents further rise of current, notwithstanding what that may do to the speed of the motor? A. That is correct. Now, there are several other matters. One, the tube 5B, which is so connected as to prevent the grid of tube 6B from becoming too far negative, in the event that we have a long period of low load on the machine. That keeps the condenser 6C from charging up to too great a value. If we did not have this tube and we had a suddenly applied load, the effect of that condenser 6C might be to limit, or might be to slow up the response of this tube 6B to that current signal and might permit a higher value of current to flow before this tube 6B can get into operation. But the effect of this tube 5B is to limit the amount to which this grid can go negative and consequently limits this conductor to going maybe five or seven volts negative, so that when the current signal does rise rapidly, due to a suddenly applied load, very quickly moves the grid into the operating range.

"Q. Moves the grid—A. Of the tube 6B, which is the current limiting tube, into its operating range.

"Q. What is the name, if any, applied to that tube 5B? A. Due to the fact that the function of this tube is to keep the tube 6B in a state of preparation, and the motto of a well known organization is 'Be Prepared', it is called the Boy Scout tube.

"Q. Now, what if any arrangements are included in this circuit to take care of the current flowing at the start of operation? A. Before the equipment is started, that is in the standby condition,

The questions as to whether or not the defendant's integral horse power Thy-mo-trol and fractional horse power Thy-mo-trol infringe the Young patents have given the court some considerable difficulty. The purpose of the devices of the Young patents is to control the flow of current to motors. They do that, though only imperfectly. The accused devices quite closely approach theoretical perfection in the control of current flowing to motors. Because of this fact, and because some of the claims of the patents may be read upon the structures of defendant's integral horse power Thy-mo-trols and fractional horse power Thy-mo-trols, plaintiffs claim infringement. The defendant, while admitting that its circuits do perfectly what the devices of the patents do imperfectly, says that the accused devices operate in different

both the forward and the reverse contactors are deenergized, and under that condition you will note that the R and F contacts connecting the top end of potentiometer 3P to the positive side of the shunt field are open. The effect of that is to reduce the speed reference signal from whatever it previously had been set at, to zero. In other words, the voltage from the cathode of this speed tube 6A, down to the bottom bus, is zero, since these two contacts R and F have been opened. At the same time, we note that although the motor is disconnected from the rectifier between forward and reverse contacts, we still have the feedback potentiometer, which is supposed to measure the armature voltage, still connected to the rectifier, so that our equipment under those conditions is actually acting as a regulator, attempting to regulate the output of the rectifier at a value which is designated by the reference, and the reference is zero. So it is attempting to regulate the rectifier to zero volts. So that when the contacts are finally closed, when the push button is pressed, whether it is in the forward or reverse direction, we find that the grids of the tubes are in the phase back condition, which they had to be in order to regulate the rectifier output voltage to the zero reference which was supplied. So under those conditions, naturally closing this with the voltage low and phased back, there is no inrush current, which is dangerous. Of course, as soon as the contacts are closed, we note that the reference voltage is again applied to this potentiometer, and as far as the speed tube is concerned—that is, the tube 6A—it tends to increase the speed, and we then depend upon the current limit tube 6B to permit the current to accelerate smoothly to the required speed.

"Q. Is there anything else about this functional horse power circuit that you feel should be mentioned, Mr. Livingston? A. I don't believe I mentioned the dynamic braking resistor, which, of course, is fairly common to most, many of these equipments, that when either the forward or reverse contacts are out, a dynamic braking resistor is thrown across the armature.

"Q. Does this fractional Thy-mo-trol circuit have variations and variants according to the use or particular application for which the customer wishes it, in a manner comparable to the integral horse power circuit? A. Yes.

"Q. What is the name under which this type of Thy-mo-trol control is known, around your organization? A. Its unofficial title?

"Q. Well, official and unofficial. A. Its unofficial title is the Thy-mo-trol junior. I think the official title is the fractional horse power Thy-mo-trol.

"Q. I have also heard it referred to as the Hank Leigh circuit; is that correct? A. That is possible, yes, sir. It was very largely as the result of Hank Leigh's work.

"Q. Are you familiar with the Patent No. 2,494,340, issued January 10, 1950, on an application filed June 4, 1944, to General Electric Company, on an application of Henry H. Leigh? A. I am not familiar with the patent in detail, but with the circuit which is used.

"Q. Is that the circuit in principle that you have just been describing? A. Yes.

"By Mr. Walker: I offer that patent in evidence.

(The said document was marked Defendant's Exhibit 114 for identification) "By Mr. Stevens: No objection.

"By the Court: It may be received.

"(The said document, so offered and received in evidence, was marked Defendant's Exhibit 114).

"By Mr. Walker: Your Honor will note, in Figure 2 of the patent there is shown the type of firing time control which results from this use of the fixed phase shifted AC component of grid voltage, plus or minus a variable DC bias, which is represented by this sliding chart, Exhibit 113, those things being attempted to be illustrated by the three positions of the alternating voltage wave shown in that Figure 2, lower left of the patent."

ways and by different means from those disclosed in the Young patents. Specifically, the defendant says that, while its integral horse power Thy-mo-trol does have a current limit effected by change in the phase of the voltage applied to the grid by a phase shifting arrangement, and while that arrangement is like that of Young's patents, yet it is just like Hull and just like a lot of others that preceded Young. Furthermore, says the defendant, the difference in means and methods by which the defendant's integral horse power Thy-mo-trol achieves the results of the devices of the patents is due to the fact that the defendant uses a saturable reactor as a variable inductance element, plus the fact that instead of the clumsy teeter-totter, the defendant uses a complicated circuit involving vacuum tubes and other elements. The plaintiff contends that there is an analogy between the variable inductance coil of Young and the saturable reactor of the defendant's integral horse power Thy-mo-trol in so far as the over-all result of shifting the phase of the grid voltage is concerned. They say that the action of the saturable reactor with respect to its average inductance is related to the amount of the flux-carrying capacity that is left in the iron within that reactor, and that that is analogous to the moving of the iron core in and out of the solenoid of the Young patents. The defendant answers that the action of its saturable reactor could only be analogous to the variable inductance of Young if the core of the Young solenoid were placed all the way in up to the intended firing time in the half cycle, if the core were then pulled out instantaneously, left out until the end of that half

cycle, instantaneously re-inserted, permitted to remain, and then pulled out again instantaneously, and so on. It further says that there is a difference in the steepness in the wave fronts of the grid voltage which are produced by defendant's saturable reactor flipping over substantially instantaneously from maximum to minimum inductance at the proper time of the firing of the tubes, and apparently the steepness of the wave front is of importance.

■ After giving the matter the best consideration of which the court is capable, and assuming that the plaintiff's patents are entitled to some range of equivalents, the court has concluded that the defendant's integral horse power Thy-mo-trol does infringe the Young patents, if they are valid. To come to this conclusion, the court is compelled to hold that the plaintiff is entitled to a certain range of equivalents; and there may be considerable doubt about this conclusion. Mr. Young was not a pioneer. At best, he was pointing out a specific method of using thyratrons after Dr. Hull in his article had indicated thyratrons might be used to control currents flowing to motors *(Note 5)*.

The court is of the opinion that defendant's fractional horse power Thy-mo-trol does not infringe for the reason, primarily, that the fractional horse power Thy-mo-trol has no phase shift method of controlling the current limit. The method by which it controls the current limit is that known in the books and the art as the AC–DC method. In the fractional horse power Thy-mo-trol, the grid voltage wave is shifted in phase, 90 degrees approximately, from the basic phase of the supply, and it stays there, never shifting

Note 5.
Dr. Albert W. Hull, of the research laboratory of the General Electric Company, in Part II of his article on "Hot-cathode Thyratrons" in Vol. 32, No. 7, July, 1929, "General Electric Review", said: "For example, in the future, thyratrons may be used in series with d-c. motors to control the starting, stopping, and braking or deceleration without the use of rheostats or contactors. The regulation of current for starting and for speed control is accomplished by varying the phase of the grid voltage with respect to anode voltage, so that current flows for only a small fraction of each positive half cycle of anode voltage when small power is desired, and for the whole half cycle when maximum power is needed (see Section 14). For deceleration the thyratron operates as an 'inverter,' as described in Section 17, converting the d-c. power of the counter e.m.f. of the motors into a-c. power which is fed back into the a-c. line, thus taking energy from the motors and delivering it to the line."

one way or the other. It is a fixed voltage, about 90 degrees out of phase with the supply voltage, and the control is effected by superimposing on the alternating out-of-phase voltage wave a variable DC potential, which varies in response to signals from appropriate circuits in the apparatus.

The court comes now to the question of the validity of the patents, and the first question in that connection necessary to be determined is the date or dates to which Young is entitled. For reasons which will be hereinafter stated, the court is of the opinion that the earliest dates that Mr. Young can be allowed are his respective filing dates, namely, March 15, 1933, for the application which resulted in Patent No. 2,179,569, and June 11, 1934, for the application which resulted in Patent No. 2,086,594. Plaintiffs' only claim with respect to the effective date of Patent No. 2,179,569 is that, because of a sketch which during the trial was known as the Teal Lake Sketch and which sketch was said to have been made on September 17, 1932, this patent should be given that as its effective date. Even if it be assumed that the Teal Lake Sketch was made on the date stated, there was no showing of diligence between that date and the filing date of March 15, 1933. The only reduction to practice of this patent is the constructive reduction to practice resulting from the filing of the application in the Patent Office. The evidence is that none of the devices of this patent was ever made. The absence of any showing of diligence and of any attempt to show it prevents this patent from having the benefit of September 17, 1932, as the date of conception. Mr. Young testified that he was shooting grouse at Teal Lake, Wisconsin on September 17, 1932. The evidence discloses that the grouse shooting season had not yet opened at that time. Furthermore, there were so many misdated sketches produced upon the trial of this case that it must be inferred from the evidence that back in the early 1930's Mr. Young had a practice of sending sketches of alleged inventions to a certain notary, who placed such dates thereon as Mr. Young might suggest, apparently without regard to actual dates. This evidence has brought the court to the conclusion that it cannot in this case rely upon evidence as to dates except such as establishes such dates beyond peradventure, like evidence of filings in the Patent Office. Patent No. 2,086,594 asserts itself to be a continuation in part of the earliest application. The plaintiffs contend that being a continuation the patent is entitled to the date of the application of which it is a continuation. This second application, however, was a continuation only in part, and, accordingly, Patent No. 2,086,594 is entitled to the date of the other only to the extent to which the disclosures are common. The plaintiffs claim that the second patent differs from the first because the second patent provides for a compound motor and also provides for what plaintiffs refer to as a "lost motion arrangement,"—though the "lost motion arrangement" is not referred to in the claims so that it is recognizable. The plaintiffs further contend that the second patent is entitled to the benefit of a date in May, 1933, because there was operating in Young's basement at that time a motor control arrangement said to be constructed in accordance with the requirements of the patent No. 2,086,594. There isn't any doubt that there was a motor control arrangement in Mr. Young's basement at the time stated. A number of persons saw it set up in the basement. Those who saw it and would have been capable of determining whether the motor was a compound motor said they did not know whether it was or not because they had not examined the motor. One or two other witnesses, who could hardly be expected to know whether the motor was compound or otherwise, saw the motor and said it was compound. Plaintiffs have not sustained the burden of proof on this issue with that kind of evidence which the court believes worthy of belief. The best evidence is that the motor was a shunt wound motor. The fact is that, from an electrical stand-point, it did not make any difference whether it was a series motor, a shunt motor or a compound motor, but the patentee claims a compound motor. If he did not have a compound motor in the base-

ment in May, 1933, he is not entitled to that date. The earliest date that the court can give him is June 11, 1934, the date of the filing of the application in the Patent Office.

The court is of the opinion that the two patents in suit disclose no invention over the following prior art:

The article by Dr. Albert W. Hull on "Hot Cathode Thyratrons," published in the "General Electric Review" in April, 1929, and July, 1929.

The Chicago Civic Opera Theatre Lighting Control, installed in 1929. In this system, thyratrons were used, both to control lights and to control a motor. This control did not involve any current limiting arrangement, in the sense that plaintiffs use the term, but did have an arrangement which effectively limited the current to an appropriate value.

Elder Patent No. 1,847,934, issued March 1, 1932, on an application filed May 20, 1930. This patent reads on the Chicago Civic Opera Company lighting control installation.

The General Electric Company Wire Reeling Application Motor Armature Control. This use was on November 6, 1930. This arrangement was one in which the motor driving the reel on which the wire was to be coiled up was supplied with rectified power through a pair of thyratrons and was caused to operate at the appropriate speed constantly varying over a wide range, that speed being one which was appropriate to cause the wire to be wound up on the reel at constant speed and constant tension, notwithstanding the fact that the effective diameter of the hub of the reel on which the wire was being wound was constantly varying because of the build-up of wire upon it. This was done by a dandy roll under which the wire was passed in such a way that any variation in speed from the desired speed resulted in a movement one way or the other of the dandy roll, a corresponding movement of the core of a solenoid coil, a corresponding change in the inductance of the inductance member of the phase shift bridge, a corresponding variation in the firing of

the thyratrons due to a shift of the phase of the voltage applied to the grids of those thyratrons, such that the necessary change in the effective voltage applied to the armature of the motor would be made, and the motor caused to operate as desired to maintain constant speed and tension.

The Stack Patent No. 1,844,699, filed June 26, 1930. This is a patent upon a device designed to keep rubber tubing from dragging upon the floor. Here the arrangement is similar in principle to that of the wire reeling apparatus in that the control is effected by a moving dandy roll, with an attached solenoid core, but in the rubber conveyor the physical alignment of the parts is just the reverse of what it was in the wire reeler for the reason that in this device, the control over the speed of the motor is effected by variation of the voltage applied to the separately excited shunt field rather than corrections to the voltage applied to the armature, as in the wire reeler.

General Electric Company Thy-ra-tron Remote Control System for United States Navy. The essence of this arrangement is that the gun is caused to respond to changes in direction of the gun sighter's telescope. The mechanics of it are that there is a selsyn attached to the gun sight and a selsyn attached to the gun, and a so-called error signal corresponding to the deviation between the positions of the armatures of the two selsyns is applied to the grids of the two pairs of tubes. That signal, which is in the form of a voltage wave, tells those thyratrons, in effect, which pair shall pass current and how much they shall pass, to the armature of the DC motor to cause that motor to turn at the appropriate speed in the appropriate direction to drive the gun to the right position. Dr. Martin A. Edwards, who had largely to do with the development of this remote control system, testified that at the beginning of the development period there was placed in this system the kind of current limiting arrangement which is the supposed invention of Mr. Young. This art was prior to any date even asserted for Young.

Standard Hand Book for Electrical Engineers 1922, page 1345, shows that all the plaintiff did is to apply to the Hull circuit a solenoid in what is the conventional way to use it, so that the movement of its core in response to variations in the current flowing in the load circuit will mechanically move the movable core of the solenoid coil, which is the variable inductance of the phase shift circuit.

Carichoff Patent No. 1,720,623, issued July 9, 1929, on an application filed January 26, 1920.

Thomson & Houston Patent No. 238,315, issued March 1, 1881, on an application filed June 26, 1880. In this patent, a solenoid shown in series with the load circuit at times when the load circuit needs correcting causes the movable core of the solenoid to rise or fall, thereby moving a pivoted lever (teeter-totter) that in turn serves to rotate the brush holder so as to change the position at which the brushes will come in contact with the segments of the commutator thereby causing constant current to be applied to the load circuit.

Lammers Patent No. 1,396,853, issued November 15, 1921, on an application filed November 7, 1916. No thyratrons are shown in this patent but there is a showing of the use of the solenoid to limit current. The solenoid is in effective series connection in the motor armature circuit.

Griggs Patent No. 1,809,625, issued June 9, 1931, on an application filed October 3, 1921. This patent shows the use of a solenoid in a load circuit. The operation of the solenoid moves an arm, constrained by a spring which changes the position of a contact on a potentiometer. The potentiometer impresses on the grid of two thyratrons a negative potential, and, as the current increases through the solenoid, the action is to pull the lever down, which increases the negative voltage impressed on the grid of the thyratrons, which tends to retard the phase of the thyratrons, or, if it goes far enough, will actually cut them off. Such a device will operate as a phase control over the first 90 degrees.

Journeaux Patent No. 2,175,547, issued October 10, 1939, on an application filed February 3, 1933. In this patent, the current that flows in the solenoid coil is directly proportional to the current flowing in the main armature circuit. The action of the solenoid determines the point in the cycle at which the thyratrons will turn on with respect to the motor.

Winograd Patent No. 2,189,828, issued February 13, 1940, on an application filed November 23, 1929. This patent shows the use of a solenoid to control current. The solenoid here is not in series with the load circuit but it is energized through transformer action in direct response to the value of circuit flowing in the primary to the anode transformer, that being directly proportional to the current flowing in the load circuit itself. This is equivalent to being directly in series with the load circuit. The moveable core of the solenoid is used to move a slider and change the value of the resistance. This is the AC-DC method of controlling the firing time which has been referred to heretofore.

Prince Patent No. 1,870,022, issued August 2, 1932, on an application filed April 17, 1931. This patent shows a phase shift scheme, including a reactor and a transformer, the secondary of which may be variably short circuited by a pair of diodes. These diodes form a resistance so that that branch of the circuit is essentially a resistance branch and the value of that resistance may be varied as the temperature of the cathodes of the tubes are varied. Their temperature may be varied by varying the current passing through them. This is a variable resistance and inductive type of phase shift.

Toulon Patent No. 1,654,949, issued January 3, 1928, on an application filed December 21, 1923 (in Germany January 4, 1923). This patent is said to be regarded as a forerunner of the phase shift. Toulon proposed to control the phase shift several different ways. In some cases the intent was to control it manually, but in the text of his patent he pointed out the possibility of making the phase shift automatic in response to some output or load quantity and to that end he suggested that it might be controlled in response to a voltmeter or ammeter in the load circuit. The following language is found in the patent:

"According to the invention, apparatus may be constructed for the automatic compensation of the drop in voltage on the lines of a main supply circuit. As I have already shown, it is feasible to vary at will and in a continuous manner the voltage or the current in the circuit supplied by the said apparatus, by changing the value of a self-induction or a resistance suitably connected to the coating (or grid) or acting directly thereupon. It is evident that this variation can be controlled by the displacement of a movable coil of a galvanometer which serves as a voltmeter or an ammeter. It is also known that the value of the self-induction of a coil with iron core will vary with the saturation of the core. This saturation varies with the magnetizing current acting upon the core. It will be an easy matter to obtain cause and effect relations between such phenomena by means of suitable arrangements of apparatus and circuits."

Alexanderson Patent No. 1,719,866, issued July 9, 1929, on an application filed March 9, 1927. This patent shows a system of phase shifting which is similar to that shown in the Hull article.

Article by W. R. King of the General Electric Company, published in "Power" on November 11, 1930: "A typical method of applying this system is to use a solenoid coil for the variable reactor. The reactance of the magnetic circuit is changed by moving the solenoid armature. This changes the reactance of the coil, which in turn, shifts the phase of the grid voltage; consequently, the direct-current output voltage is varied. In a typical case, a movement of 1-½in. of a 2-oz. armature is sufficient to change the Thyratron output voltage from zero to maximum. A small rotary regulator, similar to a Selsyn motor, may also be used to shift the phase of the grid voltage."

Article by B. S. Havens, of General Electric Company, published in "General Electric Review" of December, 1931. This article refers to the wire reeling machine and rubber conveyor, above referred to.

Translation from "A. E. G. Mitteilungen" July, 1932, pp. 250–256: "Just as it is possible to govern for constant rotary speed, it is also possible to govern for constant power or for constant torque, in that the induction regulator for the grid control, instead of being adjusted as a function of the rotary speed, is set to be a function of the current or of the power. In this case also it is fundamentally immaterial what characteristic the motor has; the grid control is merely actuated more or less frequently, or else through a greater or smaller range, depending upon what the requirement is."

Zucker Patent No. 1,851,692, issued March 29, 1932, on an application filed April 27, 1931. In this patent, the phase shift control is a network, including an inductance and a resistance, controlled by a coil connected directly in series with the armature of the motor, so that the phase shift circuit is responsive to the armature current of the motor.

Alexanderson Patent No. 1,655,040, issued January 3, 1928 on an application filed December 15, 1925. This circuit derives its grid excitation from two sources, one, a rotary device, and the other from a voltage which is developed across a resistor. The first voltage is a voltage the phase of which may be adjusted manually by turning the selsyn. The second voltage is a voltage which is derived from the current transformer, which has a secondary that is shunted by a condenser, and there is a further transformer with primaries and secondaries. This latter circuit, that is, this current transformer circuit, produces a component voltage the amplitude of which is a function of the amplitude of the current through the motor and the phase of this voltage is adjustably related by means of the condenser to the resultant phase of the anode voltage, which is the same thing as the resultant phase of the grid excitation.

Mittag Patent No. 1,654,989, issued January 3, 1928, on an application filed March 10, 1927. The current limiting circuit of this patent is basically the same as in Alexanderson Patent No. 1,655,040, but this Mittag patent provides a more elaborate control of the fixed phase relationship of the signal between the output of the current transformer and the component which

is added in the grid circuit. The circuit of this Mittag Patent, properly adjusted, will operate to limit the current under all critical conditions. It will operate over the entire range of operating conditions.

Mittag Patent No. 1,894,114, issued January 10, 1933, on an application filed February 26, 1931. The circuit of this patent also uses a current signal which it obtains from another constant potential series. It is the intent of this patent that the phase of the voltage from the constant potential transformer is actually such that it is ahead of or phase advanced from the full-on position so that as the current builds up in the rectifier and as the current signal which appears across the resistor as the signal builds up it may cause a certain retardation of the grid phase. But for a while that has no cutting down effect on the output of the rectifier so that there is a region in which the current increases from a low value to a certain predetermined value in which the rectifier remains full on.

Bethenod Patent No. 1,967,857, issued July 24, 1934, on an application filed November 21, 1933 (application in France December 29, 1932 *(Note 6)*. This patent illustrates a three-phase type of rectifier. It shows a mechanical phase shifter which is coupled to what is called a torque motor or current responsive device which is itself connected directly in series with the armature of the motor. The current responsive device produces a torque which is due to the armature current of the motor flowing directly through it, and that torque is opposed by a weight. If the current in the armature circuit falls below a certain definite limit, the weight on the device will cause the shaft to rotate clockwise and will also cause the phase shifter to operate clockwise. This rotation, due to the weight, will continue until the current increases to such a value that the current in that circuit, through this torque device, will exactly balance the torque produced by the weight. Any change of current, either up or down, in the armature circuit will cause a rotation of the shaft and a corresponding phase shift of the grids, which will tend to hold the current constant in the armature circuit. The actual control of the motor in this patent is by means of changing the field flux, and that is accomplished by changing the field current by means of a slider.

A consideration of the wealth of prior art which confronted Mr. Young when he made the disclosures of his patents convinces that if Mr. Young disclosed anything which was not already disclosed to the world in the prior art he merely disclosed what was the obvious to any one skilled in the art, and that what he disclosed did not rise to the dignity of invention.

The court is of the opinion that, at the time Mr. Young made his disclosures, the prior art contained a direct and complete anticipation of everything that he disclosed.

In 1931, a young man by the name of Allan Daniel Forbes was graduated in electrical engineering from the College of Engineering of the University of Michigan. On September 20th of that year, he entered the employ of Westinghouse Electric Corporation. For approximately six months he was employed in a student training course. During this young man's college training the only instruction he had

Note 6.

Bethenod Patent No. 1,967,857 is unquestionably prior art as to Young Patent No. 2,086,594. But whether it is prior art as to Young No. 2,179,569 depends on the date to which the Bethenod Patent is entitled in the case at bar, that is, as to whether it is entitled to the date of November 21, 1933, the date of the filing of the application in the United States Patent Office, or December 29, 1932, the date of the filing of the application in France. The court is of the opinion that it is entitled to the earlier date, namely, December 29, 1932, but there is a difference of opinion on this question among the authorities. See Fleischmann Yeast Co. v. Federal Yeast Corp., D.C.D.Md., 1925, 8 F.2d 186; Federal Yeast Corp. v. Fleischmann Yeast Co., 4 Cir., 1926, 13 F.2d 570; Celanese Corp. v. Ribbon Narrow Fabrics, 2 Cir., 1941, 117 F.2d 481. Whether Bethenod be regarded as prior art in this case makes little or no difference. There is a wealth of prior art without it.

in respect of thyratron tubes was during a minor portion of a course on Radio Principles. Mr. Forbes' training course at Westinghouse Electric Corporation did not bring him in contact in any way with thyratrons or motors or with phase shift. On April 1, 1932, Mr. Forbes was transferred from the student training course to a department of the company under the consulting control engineer, and the first job to which he was assigned by the consulting control engineer was the job of attempting to devise some means for limiting current in a thyratron type tube circuit so that the tubes would be protected when they were in a motor control circuit. The consulting control engineer told Mr. Forbes that thyratron tube circuits were very desirable for motor control, but he also said that they had definite limitations in that there were top limits of current which could be handled by them, and he said that he thought it would be possible to devise some type of circuit that would automatically limit that upper current. Mr. Forbes studied for a short time the existing circuits which were known at the time, including phase shift circuits, and attempted to modify those in some way to obtain an automatic control of the maximum current. He spent a very few days reading a write-up which was given him concerning thyratron tubes and other reading matter. He spent something less than five days in reading the available literature before he put on paper the first circuit that he devised to accomplish the current limiting purpose. The witness produced a group of papers from the files of the patent department of Westinghouse Electric Corporation, the first page of which was a notification to Mr. Forbes that the Patent Department had assigned a number to this group of papers. The second page was a notification to Mr. Forbes that the Westinghouse Electric Corporation's Patent Department had assigned a number to an application for patent. The third page of the papers was a sketch which Mr. Forbes transmitted to the Patent Department in writing his disclosure for the purpose of better explaining the operation of the invention. That paper was dated on June 20, 1932. The next three pages are a description of the events which led up to this disclosure, including a discussion of the assignment of the job to Mr. Forbes, what he did about it, and the status of the job as of the date that the information was transmitted to the Patent Department. The statement was prepared by Mr. Forbes, bore his signature, and was dated June 27, 1932. The next three pages are a description of the invention, describing in detail how it operates, signed by Mr. Forbes under date of June 20, 1932. The next page is a sketch showing the circuit. This group of papers included Mr. Forbes' sketch of the idea which was drawn on April 5, 1932, and signed by him on that date.

This matter was processed through the patent department of the Westinghouse Electric Corporation, an application for a patent was filed, and that application resulted in Forbes Patent No. 2,036,264, issued April 7, 1936, on an application filed October 31, 1933. At the time Mr. Forbes made the sketch on April 5, 1932, he had done nothing with respect to a physical apparatus in his laboratory or elsewhere but in July, 1932, he did build a circuit. The witness produced a book containing a circuit diagram of the actual circuit that he set up to try out his idea. One of the pages of this book contains the following entry "Electronic Motor Controller," "Circuit Used for Data on Pages 8 through 17 unless otherwise noted." The pages were signed "A. D. Forbes, July 13, 1932." The apparatus was set up in the laboratory of the Westinghouse Electric Corporation. The date of conception of this idea, as has been indicated, was April 5, 1932, a reduction to practice took place on July 13, 1932, and an application was filed in the Patent Office on October 31, 1933, which resulted in the patent on April 7, 1936. The story of the Forbes patent has been detailed because it shows that a young man, trained as an electrical engineer it is true, but wholly inexperienced as to thyratrons, and who, therefore, could hardly at that time be said to be "skilled in the art" developed, after a few days' study, the circuit of the Forbes disclosure. As has been indicated, this Forbes invention clearly

and directly anticipates all of the disclosures of Young. The Young patents are not only invalid for want of invention over the prior art, but are directly anticipated by the Forbes patent, and perhaps by some of the other disclosures above referred to.

There are some other issues in the case which would have greater importance if the court's views in respect thereof indicated a different result than that indicated by the views already expressed.

One of these issues is the question of the functionality of certain claims in issue in violation of the rule laid down in Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. Certain claims clearly are functional. Claims 12, 14, 15, 17, 18, 19, 20, 21, 25 and 26 of Patent No. 2,086,594 are functional and violate the rule referred to. The same defect appears in Claims 1 and 2 of Patent No. 2,179,569.

■■ By an amendment to the answer filed during the course of the trial, an issue was made as to whether or not Mr. Young was the inventor of the devices described in his patents. The court is not unmindful of the high degree of proof required on the part of a defendant who contends that the patentee named in a patent was not in fact the inventor. In the case at bar, however, the court, though mindful of the character of proof required of a defendant, has been forced to the conclusion that the evidence here negatives the possibility of Mr. Young being held to be the inventor. Mr. Young was a civil engineer. He was not an electrical engineer. When Mr. Young testified in open court, as he did, the strongest impression which he made was to the effect that he did not understand what he was talking about when he testified about the devices described in his patents and their operation. And his lack of knowledge was not that character of lack which sometimes comes from age or illness; it seemed rather to be a lack of something that had never existed. That lack of knowledge, of course, would not alone justify the court in saying that he was not the inventor of the devices shown in his patents. As the case developed, it appeared that, at the time he claimed to have made the inventions described in the patents in suit, he was habitually making sketches and causing them to be notarized and witnessed as of dates different from those on which the witnessing and notarizations actually took place. The evidence disclosed that practically every lawyer who had to do with the soliciting of the patents in suit (and a number of lawyers did have to do with their soliciting) felt called upon to raise the question as to whether Mr. Young was in fact the inventor. He steadfastly maintained that he was such inventor. No reflection upon the solicitors is intended; in the light of Mr. Young's steadfast representations, they could not have acted otherwise than they did. But it is significant that they felt called upon to question him as to whether or not he was actually the inventor. The reason was that he then displayed a lack of understanding and that a Mr. Haug, one of the two electrical engineers who worked with him, did understand. Mr. Haug and a Mr. Plaisance, another electrical engineer, worked with Mr. Young at and before the time of his claimed dates of conception. But one device embodying the ideas of the Young patents is claimed to have been made. It was first set up in Plaisance's basement and was later moved to Young's basement. The written description of the operation, identified as the first written description in the preliminary statement filed by Mr. Young in an interference in an application which resulted in Patent No. 2,179,569 was in Haug's hand-writing. Haug was intimately acquainted with the operation of the circuits of which Mr. Young claimed inventorship. Mr. Wentworth, one of the plaintiffs in a letter which has been received in evidence, says: "Haug's loyalty and continued service had been basic to the enterprise. He had done a major portion of the technical work and we had relied on Haug's expert knowledge and conclusions throughout. To review and reconstruct the soundness of these inventions without his participation would require a very substantial investment, if, in fact, a qualified and unengaged man could be found to do

it. These revelations were a clincher to the conclusions that I had been building up for sometime."

During the period of Haug's relationship with Mr. Young approximately twenty patents were taken out naming Mr. Young as inventor. Late in their relationship, one patent was taken out by Haug and four in the names of Young and Haug jointly. After the termination of the relationship in 1942 no application was filed by Mr. Young on which a patent issued, whereas fifteen applications on which patents issued was filed by Haug, fourteen in the name of Haug as the sole inventor and one jointly with one Hansen. There is evidence that Mr. Young was named as inventor of the circuits of the patents in suit pursuant to an agreement between Mr. Young and his two co-workers, Haug and Plaisance, under which the two co-workers would each have a one-third interest. For some reason, this agreement was not carried out as far as Plaisance was concerned but Mr. Young did give Haug an interest in the patents equal to his own, 45%, which interest Mr. Young later bought back for $350. In such instances as can be reconstructed from the papers found at the farm of Mr. Young and elsewhere, the original sketches and written descriptions were made by Haug, though these documents were invariably signed by Mr. Young ultimately, as the alleged inventor. It appears from several documents found in which the signatures and notarizations are incomplete, that Haug frequently signed his name as a witness before Mr. Young's name was signed. The court is satisfied that Haug or Plaisance invented what, if anything, was invented and disclosed in the two Young patents. Plaisance and Haug are both dead. It is unnecessary to belabor the point, particularly in view of the court's conclusion in respect of validity otherwise. The court is satisfied that Mr. Young did not make the inventions of the patents in suit.

The defendant relies upon the defense of laches. Mr. Young was aware of the existence and general nature of the defendant's Thy-mo-trol controls at least as early as December, 1943, at which time the existence of General Electric Company's Thy-mo-trol control and the similar Mo-to-trol control made by Westinghouse Electric Corporation were called to his attention. Shortly thereafter, on December 27, 1943, Mr. Young wrote General Electric Company for information and, on January 4, 1944, was sent a comprehensive pamphlet describing the control. Thereafter, Mr. Young permitted approximately six years to elapse before sending General Electric any notice of infringement. The plaintiff Wentworth, in 1942, regarded the situation as so hopeless that he wrote it off on his income tax return for 1941 as a complete loss. According to his testimony, he never gave it another thought until counsel who brought the present suit came to him and secured his permission to bring the suit in his name along with that of Mr. Young. Mr. Young, on August 17, 1944, wrote to Mr. Wentworth as follows: "I have been trying to locate correspondence with the General Electric Company relative to our attempt to interest them in the purchase of the patents, but have not succeeded thus far. After failure of our negotiations with the General Electric and the scuttling of the prospects by Haug in 1941, I filed the entire matter in boxes and carted them out to my farm, where they are now stored in the garage attic, and have made no further effort to exploit the patents. If they are required for your purpose, I will do some more digging next week end."

Both of plaintiffs put the matter of the patents aside and out of mind,—Mr. Wentworth in 1942, Mr. Young in 1944. The defendant has been seriously prejudiced by Mr. Young's delay. Haug and Plaisance, who, through the Hull pamphlet, obtained by them from the General Electric Company, first informed Mr. Young of the existence of thyratrons and were his co-workers in applying thyratrons to lighting circuits and to motors, are dead. Mr. Hirschl, the attorney who prepared Mr. Young's patent applications, is also dead. The only physical embodiment of Mr. Young's alleged invention, the motor control circuit, set up first in Plaisance's base-

ment, later in Young's basement, and later tested at the Illinois Institute of Technology, has been lost. Various drawings and other records, which might throw light upon the question of inventorship, cannot be found. Finally, through the non-assertion of Mr. Young's claim, defendant has continued for six years to use motors having series fields and thereby subjected itself to plaintiffs' charges, when, had it had knowledge of the claim, it could equally well have employed motors using only shunt fields, thus avoiding even the necessity of defending this litigation. Plaintiffs' excuse for not bringing suit is that the plaintiffs were misled by references in defendant's literature to the motors controlled by the Thy-mo-trol control as shunt or shunt type motors. The court is not persuaded that this excuse is sufficient. The plaintiffs, years ago, were put upon notice that the defendant was using the Thy-mo-trol control and the plaintiff could, without difficulty, have determined the type of motor which was being controlled by the Thy-mo-trol. If it were necessary to give it effect, the court would feel that this is a case for the application of the defense of laches. The court is persuaded that the real reason plaintiffs did not file suit earlier than they did was because they were discouraged by the secession of Mr. Young's co-worker Haug from the enterprise. Plaintiff Wentworth thereupon wrote off as a total loss on his income tax return for the year 1941 his entire investment in the enterprise. Plaintiff Young baled up the papers and sent them to his farm for storage. Then, after Haug died and was removed as a possible witness, Mr. Young, with Mr. Wentworth's consent, revived the matter and brought the suit at bar.

■ The defendant insists that the defendant's costs of defending this suit should be charged against the plaintiffs. The defendant points out that misdated documents and other documents reflecting Haug's inventorship were consciously withheld by plaintiffs from their purported compliance with defendant's request for documents. During the trial, plaintiff Young knowingly misrepresented, through at least one of his counsel, that such documents could not be found. Throughout the trial, witnesses were tampered with by plaintiffs. Plaintiffs' first expert had been given a 15% interest in the proceeds of the case, and this fact was not revealed until the close of his long direct examination. Plaintiffs' second expert had been promised a generous bonus in addition to his daily compensation, if plaintiffs should win the case, and, while this witness, on cross-examination, denied that he had any financial interest or that his compensation depended in any way upon the outcome of the case, it was made to appear by a letter which he then had in his brief case that he had been promised a generous bonus if plaintiffs should win the case. Plaintiffs' third expert had a similar promise of a generous bonus which was unrevealed until plaintiffs' papers were impounded for examination during the progress of the trial. One of plaintiffs' counsel, in preparation of the case, established friendly relations with the widow of Haug and had sought to influence her testimony by implying that she would be dealt with generously if plaintiffs should be successful (*Note 7*). Because of the lack of merit of

---

Note 7.

The court is hesitant to charge any lawyer with bad faith in the prosecution of a law-suit and believes that it should be stated here that counsel who came into the case during the trial as substituted counsel for Mr. Wentworth are not chargeable with bad faith or otherwise blameworthy. Of the two counsel who originally began the trial of the case for the plaintiffs, one of them is related to Mr. Young as a son. With regard to Mr. Young, the attorney, the court is of the opinion that he, so far as this case is concerned, has been in the situation of a lawyer who represents himself in a law-suit. It is true that he was not representing himself, but he was representing his father. He was so close to the case that he did not always exercise good judgment. During the course of the trial it became apparent that sketches had been suppressed and were not produced though undertakings had been made to produce all pertinent papers. Likewise, during the course of the trial, a sketch was produced from the file of one of the firms of solicitors who solicited the patents. Counsel for the plaintiffs had stated that they had not found the

plaintiffs' case and the manner in which the case has been conducted by plaintiffs before and during the trial, the court is of the opinion that the case is one in which it is appropriate not only to award substantial attorneys' fees, in addition to the normally taxable costs, but also to award defendant a sum which will not make defendant whole with respect to its entire expenses of defense, but which will partially reimburse it for such defense.

 The total expenses of the defendant incurred in defense of this case has been the sum of $127,168.88. That includes the sum of $58,100 fees paid to Messrs. Fish, Richardson & Neave and $4,310 fees paid to Messrs. Wilkinson, Huxley, Byron & Hume, or a total of $62,410 paid to the attorneys charged with the preparation for trial and trial of this case. The case was exceedingly well prepared by counsel for defendant and exceedingly well presented. The court has no hesitancy in saying that the amount paid by way of attorneys' fees to counsel was well invested and was fully justified considering the importance of the issues involved and the large amount of damages which would have been involved had there been a decision adverse to the defendant. Nevertheless, the rate of compensation has evidently been somewhat greater than the court would feel justified in charging to a losing plaintiff. The court feels that if the part of the attorneys' fees paid to these two firms charged to the plaintiffs be reduced to $40,000 the result will not be unjust to the plaintiffs. The defendant has paid for official court reporters' charges the total sum of $7,756.65. This charge includes the cost of more copies of the transcript than the court feels justified in charging to the plaintiffs. The court understands that the defendant paid one-half of the cost of the copy furnished to the court and that it also paid for three other copies of the transcript for use of its counsel and their assistants. The court is of the opinion that it may properly charge

against the plaintiffs one-half of the cost of the court's copy and the cost of the first copy thereafter which was paid for by the defendant. The court does not mean to say that counsel were unwise or extravagant in procuring the number of copies which they did procure, but is merely saying that it does not feel justified in charging more than one-half of the cost of the court's copy and the whole of the cost of the next copy paid for by the defendant against the plaintiffs. The court is of the opinion that Mr. Young is primarily responsible for the whole of the expense (as hereinbefore limited) to which defendant has been unjustly put. Mr. Wentworth, when his consent to the filing of the present suit was sought and procured, reduced his interest in the possible recovery to 20%. He has a responsibility, but not as great as that of Mr. Young. It seems to the court equitable that Mr. Wentworth be charged with not more than one-fifth of the defendant's expenses (as hereinbefore limited).

Counsel for the defendant may prepare and, within six days from this date, on notice, present drafts of findings of fact and conclusions of law not inconsistent with the views hereinabove expressed, and likewise a draft of a judgment order. Counsel for the plaintiff may, within eleven days from this date, present, in writing, their suggestions in respect of and objections to the drafts of findings of fact and conclusions of law which may be presented by the defendant. The court is not inviting a re-argument of the case, and it is suggested that the plaintiffs make only such short and specific objections or suggestions as seem necessary. Within 14 days from this date, counsel for defendant may file, in writing, any necessary reply. This having been done, the making of findings of fact, conclusions of law and a judgment order will be taken by the court without further oral argument. Counsel will please refrain from granting or asking for extensions of the times herein limited.

sketch though they had examined the file in question. The court cannot accept Attorney Young's statement in this regard but does accept that of his associate. The court thinks that the associate may have relied upon Attorney Young too heavily as to the existence or non-existence of papers and for the fixing of terms of employment of expert witnesses.